O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TAQUAN JONES,

                Plaintiff,

     v.

HOLLYWOOD UNLOCKED, INC., et al.,

                Defendants.

Case No.: 2:21-cv-07929-MEMF(PVCx)

**ORDER GRANTING DEFENDANTS JASON LEE JOHNSON AND HOLLYWOOD UNLOCKED INC.'S MOTION TO STRIKE AND GRANTING IN PART THE MOTION TO DISMISS [ECF NO. 28]**

Before the Court is the Motion to Dismiss and Motion to Strike filed by Defendants Jason Lee Johnson and Hollywood Unlocked, Inc. [1] ECF No. 28. For the reasons stated herein, the Court hereby GRANTS the Motion to Dismiss IN PART with LEAVE TO AMEND all claims dismissed without prejudice. The Court POSTPONES its determination on Defendants' Motion to Strike pending completion of the parties' relevant discovery.

---

[1] The following motions are also pending before the Court: Motion to Dismiss or, in the alternative, stay pending compel arbitration, by Defendants Bigo Technology, PTE, LTD and Bigo Technology, ECF No. 46, and Motion to Dismiss by Defendants Keiyana Fordham Pilson and Pilson Law Group. ECF No. 26. The Court addresses each of these motions in separate orders.

## I.    **Factual Background**[2]

Plaintiff TaQuan Jones ("Jones") is a social media influencer,[3] media personality, and celebrity gossip blogger. Compl. ¶¶ 2, 12. Defendant Jason Lee Johnson ("Johnson")[4] is a media personality and the founder, editor-in-chief, and CEO of the celebrity gossip website Hollywood Unlocked, Inc. (collectively, "Hollywood Unlocked Defendants").[5] *Id.* ¶¶ 3–4; ECF No. 28 at 8. Defendants Bigo Technology and Singapore-based Bigo Technology PTE, LTD (collectively, "Bigo") own and operate the social network and video platform, Bigo Live.[6] Compl. ¶ 23; ECF No. 46 at 6. Defendant Keiyana Fordham Pilson ("Pilson") is an attorney licensed to practice in California. She is employed by Defendant Pilson Law Group, PLC (collectively, the "Pilson Defendants"). Compl. ¶¶ 18, 36.

Jones, performing under the name "Tae the Mahne Tea," rose to popularity through his celebrity gossip broadcast, *The Mahne Tea*, which is streamed[7] on Bigo Live. *Id.* ¶¶ 2, 12, 23. Since his first broadcast in September 2019, Jones has amassed nearly two million followers becoming "one of [Bigo Live's] most popular artists." *Id.* ¶¶ 23–25. In April 2021, Johnson, by and through his company, Hollywood Unlocked, Inc. ("Hollywood Unlocked"), contacted Jones with a request to collaborate on Bigo Live. *Id.* ¶¶ 28–31. Though Jones initially agreed to collaborate, the partnership ended a short while later. *Id.* ¶¶ 33–34.

---

[2] Unless otherwise indicated, the following factual background is derived from the Complaint. ECF No. 1 ("Compl.")

[3] "[A] person who is able to generate interest in something (such as a consumer product) by posting about it on social media." *Influencer*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/influencer.

[4] Jason Lee Johnson refers to himself as "Lee" in his moving papers. However, during the March 31, 2022 Hearing, Johnson clarified that he goes by both "Lee" and "Johnson." Accordingly, the Court refers to Jason Lee Johnson as "Johnson" throughout this Order.

[5] *See Hollywood Unlocked*, https://hollywoodunlocked.com/ (last visited Sept. 19, 2022).

[6] Bigo Live is a video streaming platform. It allows users to broadcast or "stream" videos directly to viewers. The platform's Global Live Streaming function allows users to "stream to show their life moments, showcase their talents, interact and send virtual gifts in real time, and enjoy fun live sessions with people worldwide." *See Products*, https://www.bigo.sg/about; s*ee also Hershewe v. JOYY Inc.*, No. 2:20-CV-10611-SB-AFM, 2021 WL 6536670, at *1 (C.D. Cal. Nov. 5, 2021) (describing Bigo Live as a social media platform "which enables users to live stream their specific moments and talk live with each other").

[7] A "stream" is "digital data (such as audio or video material) that is continuously delivered one packet at a time and is usually intended for immediate processing or playback." *Stream*, Webster's Dictionary, https://www.merriam-webster.com/dictionary/stream (last visited Sept. 19, 2022). At the March 31, 2022 Hearing, Jones clarified that Bigo Live enables streamers to monetize their video streams.

2

### 1. The Alleged Harm

In June 2021, the Hollywood Unlocked Defendants made various defamatory statements about Jones's character and filed an application with the United States Patent and Trademark Office ("USPTO") for the "Mahne Tea" mark. *Id.* ¶¶ 35–83. This behavior serves the dual purpose of damaging his reputation and increasing Johnson's own internet exposure. *Id.* ¶¶ 46–70.

### 1. The defamatory language and harmful conduct

Starting on or about June 20, 2021, Johnson began to make false and disparaging statements about Jones's personal life on Bigo Live. These statements included comments insinuating that Jones has a sexually transmitted disease and is a "groomer" and "pedophile and molester." *Id.* ¶¶ 48–62. On or about September 13, 2021, Johnson filed a report with the leasing office at Jones's place of residence, reporting Jones as a pedophile. *Id.* ¶ 60. On the same day, Johnson also filed a report with the police department in Jones's municipality, reporting the same. *Id.* ¶¶ 61–62. As a result of these reports, Jones has been subject to hate mail and has lost followers on his social media accounts. *Id.* ¶ 62. The Hollywood Unlocked Defendants and other Bigo Live users have continued to make disparaging remarks about Jones on their Bigo Live broadcasts and on other social media platforms. *Id.* ¶¶ 66–67.

/ / /

/ / /

3

a. *"The Mahne Tea" Trademark*

Jones has continuously used the term "The Mahne Tea" ("The Mahne Tea" or the "Mark") on Bigo Live since launching his broadcast in 2019. *Id.* ¶ 26. In December 2020, Jones created an account on the social networking site Twitter[8] using the handle "@themahnetea."[9] *Id.* ¶ 27. On or about June 11, 2021, Johnson, by and through Hollywood Unlocked, retained attorney Pilson to register The Mahne Tea as a service mark with the USPTO despite being aware of Jones's prior use of the mark. *Id.* ¶¶ 36–38. The USPTO granted Johnson's application on June 14, 2021. *Id.* ¶ 43.

b. *Jones's Suspension from Twitter and Bigo Live*

On or about June 11, 2021, Johnson, referring to his pending trademark application for The Mahne Tea, submitted a complaint to Twitter alleging that Jones violated the platform's trademark policy by using The Mahne Tea on his Twitter page. *Id.* ¶¶ 39–41. On or about June 14, 2021, Twitter, having found Jones in violation of its trademark policy, suspended Jones's account. *Id.* ¶¶ 40–42. On the same day, the Hollywood Unlocked Defendants informed Jones that they would surrender the Mark and drop the Twitter complaint in exchange for $100,000. *Id.* ¶ 44. Jones refused their offer. *Id.* ¶ 45. Jones's account remains suspended. *Id.* ¶ 42.

---

[8] Twitter "is a service for friends, family, and coworkers to communicate and stay connected through the exchange of quick, frequent messages. People post Tweets, which may contain photos, videos, links, and text. These messages are posted to your profile, sent to your followers, and are searchable on Twitter search." A "Tweet" "is any message posted to Twitter which may contain photos, videos, links, and text." *See* https://help.twitter.com/en/resources/new-user-faq. "Followers" are people who receive a user's Tweets. https://help.twitter.com/en/using-twitter/following-faqs. Other courts in this circuit have described Twitter as a "social media platform with roughly 330 million monthly active users," *O'Handley v. Padilla*, No. 21-CV-07063-CRB, 2022 WL 93625, at *1 (N.D. Cal. Jan. 10, 2022), and as a "social networking platform" that "gives people a vehicle to express themselves online in short soundbites called 'tweets' that are limited to 140 characters. By default, any Twitter user can sign up to 'follow' any other Twitter user, which means Twitter will cause the follower to receive all tweets the author publishes. When an author publishes tweets, he's often publishing them to a wide audience, and he often has no personal connection with most members of that audience." *Nunes v. Twitter, Inc.*, 194 F. Supp. 3d 959, 960 (N.D. Cal. 2016). In November 2017, Twitter increased the number of characters in English language tweets from 140 to 280. Hayley Tsukayama, *Twitter is officially doubling the character limit to 280*, WASH. POST (Nov. 7, 2017), https://www.washingtonpost.com/news/the-switch/wp/2017/11/07/twitter-is-officially-doubling-the-character-limit-to-280/.

[9] A "handle" is the equivalent of a username. It is "how you're identified on Twitter, and is always preceded immediately by the @ symbol. For instance, Twitter Support is @TwitterSupport." *Glossary*, Twitter, https://help.twitter.com/en/resources/glossary (last accessed Aug. 10, 2022).

On or about September 17, 2021, Johnson and Hollywood Unlocked similarly reported Jones to Bigo for an alleged trademark violation for his use of "The Mahne Tea." *Id.* ¶ 63. Jones was subsequently suspended from Bigo Live for three days. *Id.* ¶¶ 64–65.

## II.    **Procedural Background**

On October 4, 2021, Jones filed this action against Defendants Hollywood Unlocked, Inc., Jason Lee Johnson, Robert Kawan Closs, Guardini Bellefleur, Bigo Technology, Bigo Technology PTE, LTD, Keiyana Fordham Pilson, and Pilson Law Group, P.C. *See generally* Compl. Jones alleges twelve causes of action: (1) civil RICO; (2) tortious interference with prospective economic advantage; (3) tortious interference with contract; (4) fraud; (5) conspiracy to commit fraud; (6) trademark infringement under § 1125 of the Lanham Act; (7) cyberpiracy; (8) trade libel/business disparagement; (9) defamation per se; (10) group boycott – per se violation of the Sherman Act; (11) specific performance; (12) declaratory relief with request for temporary, preliminary, and injunctive relief. *See id.* ¶¶ 88–168. All twelve claims are alleged against the Hollywood Unlocked Defendants. *See generally id.*

On December 20, 2021, the Hollywood Unlocked Defendants filed a Notice of Motion and Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and an Anti-SLAPP Motion to Strike pursuant to § 425.16 of the California Code of Civil Procedure. ECF No. 28 ("Mot."). The Hollywood Unlocked Defendants filed a Reply on February 18, 2022. ECF No. 52 ("Reply"). On February 20, 2022, pursuant to an order of the Chief Judge, this case was reassigned to this Court. ECF No. 50. On March 4, 2022, Jones re-noticed his Opposition to the Hollywood Unlocked Defendants' Motion to Dismiss. ECF No. 56 ("Opp'n"). The Court heard argument on March 31, 2022. Minute Order, ECF No. 65 ("March 31 Hearing").

/ / /

/ / /

## MOTION TO STRIKE

### I.    Applicable Law

### A.  Anti-SLAPP

California Code of Civil Procedure section 425.16 permits a special motion to strike a strategic lawsuit against public participation ("SLAPP"). The statute provides:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

CAL. CIV. P. CODE § 425.16(b)(1); *Kashian v. Harriman*, 120 Cal.Rptr.2d 576, 586 (Ct. App. 2002). Federal courts give full effect to the anti-SLAPP statute. *See United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 973 (9th Cir. 1999).

Anti-SLAPP motions are subject to a two-step burden shifting test. First, California Civil Code Section 425.16 requires that a defendant make "a threshold showing that the challenged cause of action [or entire complaint] is one arising from protected activity." *Navellier v. Sletten*, 52 P.3d 703, 708 (Cal. 2002); *Governor Gray Davis Comm. v. Am. Taxpayers All.*, 125 Cal. Rptr. 2d 534, 539 (Ct. App. 2002) ("First, the court decides whether the defendant has made a threshold prima facie showing . . . ."). This requires that the challenged claim arise from an "act in furtherance of the defendant's rights of petition or free speech" within the meaning of California Civil Procedure Code Section 425.16(e). *Jordan-Benel v. Universal City Studios, Inc.*, 859 F.3d 1184, 1188 (9th Cir. 2017); *Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016).

Second, if the prima facie case is satisfied, the burden shifts to the plaintiff to establish a reasonable probability of prevailing on the merits of the challenged claim. *Jordan-Benel*, 859 F.3d at 1188; *Park v. Bd. of Trustees of Cal. State Univ.*, 393 P.3d 905, 907 (Cal. 2017). This is a low burden. *See Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1163 (9th Cir. 2011) ("In the anti-SLAPP context, 'probability' is a low bar."); *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010) ("[T]he second step of the anti-SLAPP inquiry is often called the 'minimal merit' prong."). If the plaintiff cannot make this showing, the claim is stricken. *Jordan-Benel*, 859 F.3d at 1188.

**B. Leave to Amend**

A district court should generally grant leave to amend freely. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). However, "a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Id.*

**II.   Discussion**

There are four statements at issue: (1) Johnson's statement that Jones has herpes; and Johnson referring to Jones as (2) a pedophile; (3) a molester; and (4) a "groomer."[10] *See* Compl. ¶¶ 48, 50, 57; Mot. at 11.

Jones proceeds under a theory of trade libel/business disparagement and defamation *per se* in relation to all four statements.[11] Compl. ¶¶ 142–55. The Hollywood Unlocked Defendants argue that both claims must be stricken because Jones's allegations stem from the defendants' exercise of free speech. Mot. at 7.[12] Specifically, the Hollywood Unlocked Defendants argue that the speech at issue falls under the purview of anti-SLAPP because the statements were made in a public forum in connection with an issue of public interest. *Id.* at 15. Jones lodges three rebuttals: that 1) only some of the defamatory statements were made in a public forum; 2) he is not a public figure; and 3) defamatory statements do not concern the public interest. Opp'n at 12, 15–24.

/ / /

---

[10] In the Motion and accompanying affidavit, the Hollywood Unlocked Defendants argue that Johnson "do [sic] not recall ever referring to Plaintiff as a 'pedophile' [and] only recall[s] referring to [Jones] as 'Playground Platty' and 'Motha Molesta' during his broadcasts." Mot. at 11; Declaration of Jason Lee Johnson, ECF No. 28-2 ("Johnson Decl.") ¶ 22 (The Court understands "Playground Platty" to be a typographical error of the term "Playground Patty." *See* Mot. at 10). The Hollywood Unlocked Defendants also argue that they do not recall stating that Jones "has herpes." Mot. at 18. The Motion, Opposition, and Reply make no mention of the Hollywood Unlocked Defendants' use of the term "groomer." However, as discussed in more detail in Section II.A, the Court must apply the motion for summary judgment standard on this motion to strike. Accordingly, as the Court deems that it cannot make a final determination on these statements until relevant discovery has concluded.

[11] The Motion only refers to one speech related cause of action—defamation *per se*. Mot. at 14. However, the Complaint and Opposition make clear that Jones pursues two speech-related claims against the Hollywood Unlocked Defendants. *See* Compl. ¶¶ 142–55.

[12] Page 13 of the Motion contains a reference to a documentary film, a subject that is not at issue in this case. As clarified at the hearing, this reference is a typographical error.

**A. The Court may not rule on the motion to strike until the parties have completed sufficient discovery.**

Before the Court can analyze the sufficiency of the Hollywood Unlocked Defendants' Motion to Strike, it must first consider whether it is proper to adjudicate this Motion at this juncture or postpone adjudication until after discovery has taken place. An anti-SLAPP motion to strike can be litigated in two ways: (1) as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) or (2) as a motion for summary judgment pursuant to Rule 56. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018). The Court applies the Rule 12(b)(6) standard if a defendant moves to strike based solely on the *legal* sufficiency of the plaintiff's claims. *Id.* However, if the motion to strike challenges the *factual* sufficiency of the claims, the Court must apply the Rule 56 standard. *Id.* Applying the Rule 56 standard, however, "invokes the same treatment as a motion for summary judgment, triggering discovery." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155–56 (9th Cir. 2021) (quotation marks omitted) (discussing *Planned Parenthood*, 890 F.3d at 833). Accordingly, if a court deems the Rule 56 standard appropriate, it must delay ruling on the motion to strike until the parties have completed sufficient relevant discovery. *See Herring Networks*, 8 F.4th at 1155.

The Hollywood Unlocked Defendants do not explicitly state which of the two standards they seek to apply to this motion. Indeed, the Hollywood Unlocked Defendants include both standards in their applicable legal standard. *See* Mot. at 15 (citing *Navellier v. Sletten*, 131 Cal. Rptr. 2d 201, 205 (Ct. App. 2003) ("[P]laintiffs' burden as to second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment") and *Premier Medical Mgm't Sys., Inc. v. Cal. Ins. Guarantee Ass'n*, 39 Cal.Rptr.3d 43, 53 (Ct. App. 2006) ("The second step [of an anti-SLAPP claim] usually requires that plaintiffs demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment . . . .") (citations and quotation marks omitted)).[13]

---

[13] In the Opposition, Jones cites to *Wilbanks v. Wolk*, 17 Cal. Rptr. 3d 497, 512 (Ct. App. 2004), in support of the proposition that he need only produce "evidence . . . demonstrat[ing] that the suit is viable." Opp'n at 20. The specific portion cited by Jones refers to the use of affidavits and other supporting evidence. *Wilbanks*, 17 Cal. Rptr. 3d at 512 ("[The anti-SLAPP statute is] construed to require the lower court to consider the

There are multiple indicia that the Hollywood Unlocked Defendants are seeking to proceed under the motion for summary judgment standard. The Hollywood Unlocked Defendants repeatedly state that Jones has failed to "provide[] evidence showing his probability of success." *See* Mot. at 17 ("Plaintiff cannot meet his burden of coming forward with admissible evidence to show that she [sic] has a probability of prevailing on his defamation claim."); Reply at 8; *see also id.* at 5 ("Plaintiff fails to provide a single statement where Defendants refer to him as either a pedophile, molester, or that he has herpes."). The Hollywood Unlocked Defendants also provide a declaration of Johnson and attached exhibits providing facts regarding the falsity of the alleged statements and calling into question whether Johnson, or any of the other Hollywood Unlocked Defendants, made the statements at issue in this case. *See* Declaration of Jason Lee Johnson, ECF No. 28–2 ("Johnson Decl.") ¶ 22; *see also id.*, Exs. A–D. The facts alleged in the declaration and exhibits are referenced in the Motion and present a factual challenge as to whether the alleged statements were made by the Hollywood Unlocked Defendants. *See* Mot. at 9, 18. Jones does not provide rebuttal evidence.

On the other hand, the Hollywood Unlocked Defendants also appear to argue that the Rule 12(b)(6) standard is applicable. Indeed, they state that Jones "fails to show that his [state law] claims are likely to succeed," Reply at 5, and appear to argue that the Motion to Strike should be granted based on their motion to dismiss. *See id.* at 8 ("[B]ased on the above-stated, Plaintiff has not provided evidence showing his probability of success, and as such the Court should grant Defendant's [sic] *motion to dismiss*, and attorney's fees and costs should be awarded to Defendants under the California Anti-SLAPP statute.") (emphasis added). Moreover, the Opposition treats the Anti-SLAPP motion to strike as one proceeding under Rule 12(b)(6), *see, e.g.*, Opp'n at 24 (arguing that the Complaint is "legally sufficient"); Opp'n at 23. The Reply does not appear to contest Jones's analysis, and also largely appears to discuss the sufficiency of the Complaint. *See generally* Reply at

---

challenged plaintiff's affidavits for the purpose of determining whether sufficient evidence has been presented to demonstrate a prima facie case and, in making this judgment, the trial court's consider of the defendant's opposing affidavits does not permit a weighing of them against a plaintiff's supporting evidence . . . ."). This also implies that Jones understands the Rule 56 standard to be applicable in this context.

3–8. The Reply, however, still argues that Jones has not "provided enough evidence" to meet the various elements of his state law claims. *See id.* at 3, 8.[14]

In sum, viewing the content of the Motion and Opposition, the declaration and the accompanying exhibits, the Court finds the Hollywood Unlocked Defendants' Motion to Strike analogous to a Rule 56 motion for summary judgment, not a Rule 12(b)(6) motion to dismiss. Indeed, the Court is unable to determine whether Jones has met his burden under the second element of the anti-SLAPP inquiry without engaging in some amount of factual inquiry—namely, whether the Hollywood Unlocked Defendants actually made the statements at issue, and whether the statements were indeed false. As such, the Court must postpone ruling on the Motion to Strike until the parties have completed sufficient discovery regarding the factual challenges alleged by the Hollywood Unlocked Defendants. *See Planned Parenthood*, 890 F.3d at 834 ("[W]hen an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply. But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, *before* any decision is made by the court."); *see also Herring*, 8 F.4th at 1156 ("[A] defendant may assert a factual challenge, which invokes the same treatment as a motion for summary judgment, triggering discovery.") (quotation marks omitted). The Court therefore does not consider the parties' arguments as to the motion to strike.

<strong><u>MOTION TO DISMISS</u></strong>

**I.     <u>Applicable Law</u>**

**A.  Motion to Dismiss pursuant to Rule 12(b)(6)**

Under Federal Rule of Civil Procedure Rule 12(b)(6), a party may file a motion to dismiss for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The purpose of Rule 12(b)(6) is to "enable defendants to challenge the legal sufficiency of claims asserted in a

---

[14] It should also be noted that the Hollywood Unlocked Defendants do not lodge separate arguments regarding the sufficiency of Jones's trade libel/business disparagement and defamation *per se* claims under Rule 12(b)(6). It therefore appears that the Hollywood Unlocked Defendants intend to have their Motion to Strike serve as their position on the merits of these two claims in the context of the entire action. Accordingly, the Court postpones ruling on Jones's trade libel/business disparagement claim and defamation *per se* claim under the Rule 12(b)(6) standard until it can appropriately rule on the Motion to Strike.

complaint." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987). A district court properly dismisses a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts to support a cognizable legal theory. *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* While a complaint does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than "threadbare recitals of the elements of a cause of action." *Id.* at 678. "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Caltex*, 824 F.3d at 1159; *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."). This tenet, however, is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

### B.  Rule 9 heightened pleading standard

While all complaints must plead sufficient factual allegations to survive a 12(b)(6) motion, allegations containing elements of fraud are held to a heightened pleading standard. Under Federal Rule of Civil Procedure 9(b), when alleging fraud or mistake, a party must state with "particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED R. CIV. P. 9(b). When evaluating the sufficiency of a pleading under Rule 9(b), a pleading is sufficient "if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. While statements of the

time, place, and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) (citing *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987)). Further, the Ninth Circuit has made clear that this heightened pleading standard also applies to fraudulent concealment claims. *See Kearns v. Ford Motor*, 567 F.3d 1120, 1126–27 (9th Cir. 2009).

### C. Leave to amend

A district court should generally grant leave to amend freely. *Cervantes.*, 656 F.3d at 1041.However, "a district court may dismiss without leave where a plaintiff's proposed amendments would fail to cure the pleading deficiencies and amendment would be futile." *Id.*

### II. Discussion

#### A. Extrinsic evidence

Before the Court can discuss the merits of the Hollywood Unlocked Defendants' Motion to Dismiss, it must first rule on the admissibility of the extrinsic materials submitted in support of the Motion. When adjudicating a motion to dismiss under Rule 12(b)(6), a court may not consider matters outside of the pleading without converting the motion into a Rule 56 motion for summary judgment. FED. R. CIV. P. 12(b)(6); 12(d); *see also United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003) ("When ruling on a Rule 12(b)(6) motion to dismiss, if a district court considers evidence outside the pleadings, it must normally convert the 12(b)(6) motion into a Rule 56 motion for summary judgment, and it must give the nonmoving party an opportunity to respond.").

The Hollywood Unlocked Defendants submit the Declaration of Defendant Jason Lee Johnson ("Johnson Decl.") and Exhibits A–D in support of their Motion. ECF No. 28–2, Exs. A–D. The declaration includes a summary of Johnson's professional career and additional details regarding interpersonal relationships between Johnson and Jones and factual context regarding the nature of the alleged insults. *See generally* Johnson Decl. However, given the early stage of the litigation, the Court declines to convert this 12(b)(6) motion to a motion for summary judgment.[15] At

---

[15] *See, e.g.*, *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 952 (N.D. Cal. 2015) (doing the same).

the March 31 Hearing, the Hollywood Unlocked Defendants stated that they submitted the declaration and exhibits to "provide the Court with more background information as to how the events transpired." However, the Hollywood Unlocked Defendants did concede that the Court may not consider such evidence on a Rule 12(b)(6) motion to dismiss. As such, the Court excludes the Johnson Declaration and the Hollywood Unlocked Defendants' exhibits and does not consider them in its analysis. The Court also does not consider any of the Hollywood Unlocked Defendants' arguments based on the extrinsic evidence nor any of the allegations included in the Motion's statement of facts derived from said evidence. *See, e.g.*, Mot. at 8–11.

### B. Jones's civil RICO claim is improperly pleaded as he fails to allege a "racketeering activity."

The Hollywood Unlocked Defendants seek dismissal of Jones's first cause of action for civil RICO, arguing that Jones merely alleges "conclusory statements" that fail to establish their liability. Mot. at 23. Under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). A violation of Section 1962(c) requires: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Each element of the claim is necessary to sustain an action under RICO. *Id.* ("The plaintiff must, of course, allege each of these elements to state a claim."). Moreover, a plaintiff "cannot claim that a conspiracy to violate RICO existed [under Section 1962(d)] if they do not adequately plead a substantive violation of RICO." *Sanford v. MemberWare, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) (quoting *Howard v. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000)).

A plaintiff must have standing to bring a civil RICO claim. Crucially, this requires that the plaintiff plead the existence of racketeering activity within the meaning of the RICO statute. "Racketeering activity" is defined under RICO as including any act "indictable" under certain enumerated federal criminal statutes. 18 U.S.C. § 1961(1)(B). This includes the statutes establishing

mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1399 (9th Cir. 1986) (citing 18 U.S.C. § 1961(1)(B)).

In the Complaint, Jones alleges that he bases his RICO claim on "threats of violence," wire fraud, and mail fraud. Compl. ¶ 93. However, aside from a passing mention in paragraph 93, the Complaint fails to discuss wire and mail fraud. Indeed, the focus of Jones's arguments in the Opposition and the Hollywood Unlocked Defendants' arguments in the Motion rest on trademark infringement. *See* Mot. at 22–23; Opp'n at 26–27. Moreover, at the March 31 Hearing, Jones clarified that his RICO claim is based on trademark infringement. Trademark infringement is not one of the enumerated federal crimes "indictable" under RICO. The closest corollary, misappropriation of trade secrets, proceeds under 18 U.S.C. §§ 1831, 1832—two statutes wholly independent from trademark infringement under the Lanham Act, 15 U.S.C. §§ 1051, *et seq*. Accordingly, Jones has failed to plead "racketeering activity" sufficient to establish standing under civil RICO. As the Complaint contains no allegations relating to wire fraud and mail fraud, and the parties fail to discuss either claim in their briefing, Jones has failed to establish that he has standing to pursue a RICO claim under either statute. As Jones has failed to allege a racketeering activity, the Court need not address RICO's five elements. The Court thus GRANTS the Motion to Dismiss as to Jones's first cause of action. As it is theoretically possible that Jones may still be able to allege a RICO claim under a theory of wire or mail fraud, this claim is dismissed WITH LEAVE TO AMEND. *See Cervantes*, 656 F.3d at 1041.

### C. Jones has failed to properly plead his claim for tortious interference with prospective economic advantage.

The Hollywood Unlocked Defendants argue that Jones's second cause of action for tortious interference with prospective economic advantage must be dismissed because Jones "fails to provide any factual showing" that satisfies the elements of the claim. Mot. at 23–24. The Hollywood Unlocked Defendants further argue that Jones has not provided sufficient factual support indicating how their act of filing complaints with Twitter and Bigo regarding Jones's violation of the sites'

service terms. Mot. at 24.[16] In response, Jones maintains that he has plead sufficient facts to meet the elements of this claim. Opp'n at 27–28.

There are five elements of a claim for tortious interference with prospective economic advantage: (1) "the existence of a business relationship between the plaintiff and a third-party, with the prospect of a future economic benefit to the plaintiff"; (2) "the defendant's knowledge of the relationship"; (3) "the defendant's intentional acts to disrupt the relationship"; (4) "actual disruption of the relationship"; (5) "the defendant's intentional acts caused the plaintiff economic harm." *Youst v. Longo*, 729 P.2d 728, 733 n.6 (Cal. 1987); 5 Witkin, Summary 11th Torts § 855 (11th ed. 2022) ("Witkin") (citing *Contemporary Servs. Corp. v. Staff Pro*, 61 Cal. Rptr. 3d 434, 449 (Ct. App. 2007)).

However, as intentionally interfering with a prospective economic advantage is not "a wrong in and of itself," a plaintiff must plead that the defendant's underlying conduct qualifies as an "independently wrongful act." *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 953 (Cal. 2003); *see also Winchester Mystery House, LLC v. Glob. Asylum, Inc.*, 148 Cal. Rptr. 3d 412, 425 (Ct. App. 2012) (same).

Jones argues that he has sufficiently met each element of a tortious interference with economic advantage claim. Opp'n at 27–28. The Court addresses each element in turn.

/ / /

/ / /

---

[16] In their Motion, the Hollywood Unlocked Defendants specifically refer to factual allegations not alleged in the Complaint in support of their motion to dismiss this claim. *See* Mot. at 24. However, as stated *supra* Section II.A, the Court may not, and subsequently cannot, consider such evidence on a 12(b)(6) motion to dismiss. Accordingly, the Court only includes the allegations made in the Complaint in its analysis of this claim.

      i. <u>Jones has alleged the existence of a business relationship between the plaintiff and a third-party, with the prospect of a future economic benefit to the plaintiff.</u>

In support of the first element—the existence of a business relationship between the plaintiff and a third-party, with the prospect of a future economic benefit to the plaintiff—Jones argues that he has alleged the existence of a relationship between himself and Bigo.[17] Compl. ¶¶ 23–27, 31–32. In relevant part, the Complaint provides:

> 23. In September 2019, Plaintiff began broadcasting as the Mahne Tea on the BIGO Live platform. His first episode streamed on or about September 8, 2019.
> 24. As a media personality, Plaintiff works primarily in the area of celebrity gossip.
> 25. Plaintiff and his content quickly resonated with BIGO Live viewers. In approximately one year, Plaintiff gained nearly two million followers and became one of the most popular broadcasters on the site.
> 26. At all relevant times, Plaintiff used The Mahne Tea mark on BIGO Live. This mark was distinctive and used to identify himself to followers.
> 27. In December 2020, Plaintiff created a Twitter domain using his The Mahne Tea mark, www.twitter.com/themahnetea.
> [. . .]
> 31. On BIGO Live, broadcasters' earnings are multifactorial. Upon information and belief, some broadcasters qualify to receive a salary based upon content type, number of followers, and time spent broadcasting. Broadcasters can also receive virtual gifts from viewers, which can then be exchanged for money.
> 32. More followers and more views equal higher earnings.

*Id.* ¶¶ 23–27, 31–32.

The tort of interference with prospective economic advantage only applies to "interference with *existing* noncontractual relations which hold the promise of future economic advantage. In other words, it protects the expectation that the relationship eventually will yield the desired benefit, not necessarily the more speculative expectation that a potentially beneficial relationship will eventually arise." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 49 Cal. Rptr. 2d 793, 804 (Ct. App. 1996)

The crux of Jones's claim rests on his use of the Bigo Live platform and the fact that he has generated revenue from the site. Compl. ¶¶ 23–27. The Complaint states that Bigo Live

---

[17] The Opposition appears to advance a separate theory: that Jones was in a business relationship with his followers, not with Bigo itself. *See* Opp'n at 28. However, as the Court's duty on a 12(b)(6) motion to dismiss is to evaluate the sufficiency of the *complaint*, the Court is bound strictly to the Complaint's allegations. *See* Rutter Group Prac. Guide Fed. Civ. Pro. Before Trial, Calif. & 9th Cir. Eds. § 9:181 (April 2022 ed.) ("A *complaint* can be attacked at any time on the ground that it fails to state a claim for relief.") (emphasis added).

broadcasters' "earnings are multifactorial. [S]ome broadcasters qualify to receive a salary based upon content type, number of followers, and time spent broadcasting. Broadcasters can also receive virtual gifts from viewers, which can then be exchanged for money. More followers and more views equal higher earnings." *Id.* ¶¶ 31–32. While the Complaint does not state how much revenue Jones acquired from his Bigo streams or provide any additional information regarding the operation of Bigo's pay structure,[18] the Complaint does allege that Jones had nearly two million followers, making him "one of the most popular artists on the site." *Id.* ¶¶ 2, 30. Viewing the allegations in the light most favorable to Jones, it follows that Jones likely generates at least some income from the platform with some regularity. *See Manzarek*, 519 F.3d at 1031("We accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."). The California Court of Appeal cautions against finding an existent business relationship in "purely hypothetical relationships." *See Westside Ctr. Assocs.*, 49 Cal. Rptr. 2d at 803. The Court, however, finds that the Complaint contains sufficient allegations to push the existence of his economic relationship with Bigo from hypothetical to plausible. *See Ebner*, 838 F.3d at 963 ("Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'").

    ii.  <u>Jones has alleged that the Hollywood Unlocked Defendants had knowledge of his relationship with Bigo.</u>

In support of the second element— the defendant's knowledge of the relationship—Jones further provides that the Hollywood Unlocked Defendants had knowledge of his business relationship with Bigo Live because the Hollywood Unlocked Defendants had intentionally contacted Jones with the intention of collaborating with him on Bigo. Compl. ¶¶ 29, 30; Opp'n at 28.

---

[18] At the March 31 Hearing, Jones clarified that he is a Bigo Live "host," which entitles him to be paid by Bigo for his streams. An individual seeking to become a host is required to audition. If ultimately selected, a new host must then create an "agency," which Jones defined at the hearing as "a number of people that have a Bigo Live.us or a Bigo Live.TV handle" who "work for Bigo" and "assist in . . . broadcasting." Bigo Live hosts are given a monthly base salary, which varies from host to host. Jones clarified that he receives a base salary of $24,000 and generates further revenue through merchandise sales, also hosted on Bigo Live. Jones conceded that this information is not included in the Complaint and requested leave to amend.

Jones alleges that the Hollywood Unlocked Defendants' impetus for this collaboration was at least in part, to "give [Johnson] visibility to [Jones's] nearly two million followers" and possibly boost the numbers of Johnson's followers, live streams, and, ultimately, revenue. *Id.* ¶¶ 30, 32.

Viewing the allegations in the light most favorable to Jones, the Court finds that the Complaint states that the Hollywood Unlocked Defendants were aware of the economic benefits derived from Jones's Bigo followers and sought to avail themselves of the same benefits. The Court thus finds that Jones has satisfied the second element.

iii.   <u>Jones has satisfied the third and fourth elements.</u>

The third element under this claim requires that the Complaint allege that the Hollywood Unlocked Defendants' intentional acts to disrupted Jones's relationship with his Bigo Live followers. The fourth element requires that said relationship have been actually disrupted. *See Youst*, 729 P.2d at 733 n.6.

The Complaint provides that the Hollywood Unlocked Defendants sought to interfere with Jones's ability to generate revenue from Bigo by retaining the Pilson Law Group to register the Mahne Tea as a service mark. *See* Compl. ¶¶ 36–38, 63–65; Opp'n at 28. The Complaint further alleges that the Hollywood Unlocked Defendants used the trademark application to have Jones suspended from Bigo for three days, rupturing his relationship with his followers. Compl. ¶¶ 63–65.

To succeed on the third element of intent, a plaintiff "must plead and prove intentional acts designed to disrupt the relationship." Witkin § 856. The Complaint need not contain facts specifically indicating intent. Instead, "[i]ntent may be established by inference." *Id.* (citing *Seaman's Direct Buying Service v. Standard Oil Co.*, 686 P.2d 1158, 1165 (Cal. 1984), *overruled on other grounds*, *Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669 (Cal. 1995)); *Winchester Mystery House, LLC*, 148 Cal. Rptr. 3d at 425 ("[T]o satisfy the intent requirement for this tort, it is sufficient to plead that the defendant knew that the interference was certain or substantially certain to occur as a result of its action.") (citing *Korea Supply Co.*, 63 P.3d at 950).

Jones has met the third element. As evidence of intent may be inferred, the Court finds the Complaint contains sufficient allegations to create a logical inference that the Hollywood Unlocked

18

Defendants, aware of Jones's popularity on Bigo Live and of his use of "Tae Mahne Tea" in relation to his Bigo Live broadcast, sought to trademark the "Mahne Tea" after Jones reneged on their Bigo broadcast collaboration. *See* Compl. ¶¶ 4–5, 28–34, 36–38. The Complaint further creates the inference that the Hollywood Unlocked Defendants then used proof of the trademark application to have Jones suspended from Bigo Live for three days, all while knowing that the suspension would interfere with Jones's Bigo Live stream and, likely, revenue. *Id.* ¶¶ 63–65.

The Court also finds that this inference establishes that Jones has met the fourth element for actual disruption of the relationship. The Court may look to the temporal proximity between the Hollywood Unlocked Defendants' actions and the disruption in Jones's relationship with Bigo. *See Overhill Farms, Inc. v. Lopez*, 119 Cal. Rptr. 3d 127, 144 (Ct. App. 2010) (Courts may consider "whether, in the circumstances of the case, the proximity of the alleged cause and effect tends to demonstrate some relevant connection."). Here, the Complaint alleges that Jones was suspended from Bigo Live on the same day that the Hollywood Unlocked Defendants reported Jones's account for trademark infringement. *See* Compl. ¶¶ 63–65. The close proximity between the Hollywood Unlocked Defendants' report and Jones's suspension creates an inference of causation—making it plausible that the Hollywood Unlocked Defendants' report led to the interruption in Jones's relationship with Bigo. *See, e.g.*, *Overhill Farms, Inc.*, 119 Cal. Rptr. 3d at 144 (where two weeks between the defendant's alleged wrongful act and the interruption in plaintiff's business relationship were deemed sufficient to satisfy the fourth element.). This is all that is required on a 12(b)(6) motion to dismiss. *See Iqbal*, 556 U.S. at 678.

As such, the Court finds that Jones has met the third and fourth elements.

> iv.  Jones has failed to sufficiently show that he suffered economic harm.

The Court now turns to the fifth element—whether the defendant's intentional acts caused economic harm. *Youst*, 729 P.2d at 733 n.6. Here, Jones's allegations indicate that being suspended from Bigo Live for three days prevented him from generating revenue from the platform. *See* Compl. ¶¶ 23–32. The Complaint fails to allege, however, whether Jones planned to or ordinarily would have held a Bigo Live broadcast on those three days. Moreover, while the Complaint may

indicate that Jones has alleged sufficient facts indicating that he can and does generate revenue from Bigo Live, as previously stated, the Court finds that the Complaint fails to explain how revenue is generated. It does not explain whether Jones makes income from every Bigo broadcast he hosts or if each individual broadcast must be a certain length or contain specific content to generate revenue. Indeed, the frequency of Jones's Bigo Live broadcasts (for example, whether they were hosted on multiple days of the week, or if they ordinarily took place on a Monday rather than a Wednesday) is unclear from the Complaint. In the absence of such facts, the Court—even viewing the facts in the light most favorable to Jones—cannot determine whether the Hollywood Unlocked Defendants' actions indeed interfered with Jones's economic benefit from Bigo.

Accordingly, the Court finds Jones's tortious interference with prospective economic advantage claim improperly pleaded.

> v. <u>Jones has not shown that the Hollywood Unlocked Defendants' intentional acts were wrongful.</u>

Finally, the Court finds that even if the Complaint had sufficiently met all five elements of the tort of interference with prospective economic advantage, the claim would still fail as Jones has failed to allege an independently wrongful act. California law mandates that a plaintiff must plead that the defendant's underlying conduct qualifies as an "independently wrongful act." *Korea Supply Co.*, 63 P.3d at 953.

The Complaint links two wrongful acts to Jones's claim of tortious interference with prospective economic advantage: (1) trademark infringement and related extortion,[19] and (2) defamation *per se* and trade libel/business disparagement. *See* Compl. ¶¶ 31–63; 101–04. The Complaint specifically alleges the following:

> 101. By committing The Wrongful Acts, Defendants intended to disrupt the economic relationship or knew disruption was certain or substantially certain to occur.
> 102. Due to Defendants' wrongful interference, the economic relationship has been disrupted, causing Plaintiff harm and damages, including, but not limited to, lost revenue, lost sponsorships, and lost opportunity for ancillary revenue.

---

[19] Jones's extortion claim is not addressed in either party's briefing.

20

> 103. Defendants' Wrongful Acts were a substantial factor in causing Plaintiff's harm.
>
> 104. Defendants, by engaging in the herein described acts and omissions, and/or by authorizing or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard for Plaintiff's rights, welfare, and safety . . . .

Compl. ¶¶ 101–04.

As discussed *infra* Section II.G, the Court finds Jones's trademark infringement claim insufficiently pleaded. Accordingly, Jones's trademark infringement claim cannot serve as the "wrongful act" in support of his tortious interference with prospective economic advantage claim.

Similarly, as discussed above, the Court has postponed ruling on Jones's defamation *per se* and trade libel/business disparagement claims until the parties have had an opportunity to conduct sufficient discovery. As the Court cannot presently determine whether the Hollywood Unlocked Defendants' speech qualifies as wrongful, such claims cannot serve as the wrongful acts.

In sum, as Jones's tortious interference with prospective economic advantage claim is insufficiently pleaded, the third cause of action is DISMISSED WITH LEAVE TO AMEND.

### D. Jones's tortious interference with contract claim is improperly pleaded.

The Hollywood Unlocked Defendants address Jones's third cause of action for tortious interference with contract claim in conjunction with Jones's tortious interference with prospective economic advantage claim. Mot. at 23–24. As such, the Hollywood Unlocked Defendants' arguments as to this claim are identical to those lodged in support of dismissal of Jones's tortious interference with prospective economic advantage claim. *See id.*; *see also* Section II.C. In response, Jones argues that he has sufficiently alleged all elements of this tort. Opp'n at 28.

Under California law, a claim for tortious interference with contract requires "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513, 530 (Cal. 1998); *Sole Energy Co. v. Petrominerals Corp.*, 26 Cal. Rptr. 3d 798, 817 (Ct. App. 2005). "Unlike the tort of interference with prospective economic advantage," the defendant's conduct need not be "wrongful apart from the interference

itself." Witkin § 843; *Quelimane Co.*, 960 P.2d at 530. To succeed on this claim, a plaintiff must allege facts showing that the defendant was aware of the existence of the contract. *Pac. Gas & Elec. Co v. Bear Stearns & Co.*, 791 P.2d 587, 590 (Cal. 1990).

The Court finds that Jones has failed at the first element. While the Court has found that Jones has plausibly alleged that he derives an economic benefit from his relationship with Bigo, *see supra* Section II.C.1, the Complaint fails to allege the existence of a contract between Jones and Bigo.[20] As Jones's failure to meet the first element is sufficient to grant dismissal, the Court does not consider the remaining four elements—namely whether the Hollywood Unlocked Defendants were aware of a contract between Jones and Bigo; whether the Hollywood Unlocked Defendants' actions were "designed to induce a breach or disruption of the contractual relationship"; whether there was an "actual breach or disruption of the contractual relationship"; and whether Jones suffered any actual damage. *Sole Energy Co.*, 26 Cal. Rptr. 3d at 817. The Court hereby GRANTS the Motion to Dismiss as to the third cause of action. As the Court finds that Jones may still be able to establish the existence of a contractual relationship between himself and Bigo, this claim is DISMISSED WITH LEAVE TO AMEND. *See Cervantes*, 656 F.3d at 1041.

### E. Jones's fraud claim is improperly pleaded.

The Hollywood Unlocked Defendants argue that Jones's fourth cause of action for fraud must be dismissed as the Complaint fails to sufficiently plead the elements of fraud to meet the Rule 9(b) heightened pleading standard. Mot. at 10–11. In response, Jones contends that the Complaint alleges relevant facts with sufficient particularity to meet the required standard. Opp'n at 28–30.

As stated above, *see supra* Section I.B, the Rule 9(b) heightened pleading standard requires a plaintiff to "state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). The complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct, "as well as what is false or misleading about" it, and "why it is false." *Cafasso v. Gen. Dynamics*, 637

---

[20] Indeed, Jones has conceded that the Complaint must be amended to satisfy this first element *See supra* n.18. The Court notes that the parties do not dispute the existence of the User Agreement that is the basis of Bigo's Motion to Stay, ECF No. 46; this User Agreement is not pleaded in the Complaint as the contract Jones's claims are based upon.

F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted); *see also Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("[Rule 9(b) requires] the times, dates, places, benefits received, and other details of the alleged fraudulent activity.").

Jones appears to rest his fraud claim on the Hollywood Unlocked Defendants' registration of the Mark with the USPTO. *See* Compl. ¶¶ 112–15. Although not explicitly stated in the Complaint or moving papers, Jones appears to proceed under a theory of fraud in procuring the trademark.

"Fraud in procuring a mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application." *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006) (citing *L.D. Kichler Co. v. Davoil, Inc.*, 192 F.3d 1349, 1351 (Fed. Cir. 1999)); *see also* 15 U.S.C. § 1120 ("Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof"); 6 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 31:85 (5th ed. 2022).

"[T]he burden of proving that a party fraudulently procured a trademark registration is heavy." *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990) (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 942 (10th Cir. 1983)). A plaintiff must establish the following five elements: "(1) a false representation regarding a material fact; (2) the registrant's knowledge or belief that the representation is false; (3) the registrant's intent to induce reliance upon the misrepresentation; (4) actual, reasonable reliance on the misrepresentation; and (5) damages proximately caused by that reliance." *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013) (citing *Robi*, 918 F.2d at 1444).

Although not explicitly alleged, Jones appears to argue that the Hollywood Unlocked Defendants made a representation, through the Pilson Defendants, in conjunction with the application to register the Mark. *See* Compl. ¶ 112. "Federal registration of a trademark constitutes prima facie evidence of the validity of the registered mark and of [the registrant's] exclusive right to use the mark in commerce." *Quiksilver, Inc.*, 466 F.3d at 755 (quotation marks omitted) (citing *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999)).

However, the Court's Order on the Pilson Defendants' Motion to Dismiss (ECF No. 61) acknowledges that Hollywood Unlocked's application to register the Mark was still pending as of the date of this Motion. *See* TSDR Record. As such, the presumption of validity does not apply.

When applying to register a trademark, the applicant must include a verified statement in which the applicant specifies the following:

> (A) the person making the verification believes that he or she, or the juristic person in whose behalf he or she makes the verification, to be the owner of the mark sought to be registered;
> (B) to the best of the verifier's knowledge and belief, the facts recited in the application are accurate;
> (C) the mark is in use in commerce; and
> (D) to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive, except that, in the case of every application claiming concurrent use, the applicant shall--
> (i) state exceptions to the claim of exclusive use; and
> (ii) shall1 specify, to the extent of the verifier's knowledge--
> (I) any concurrent use by others;
> (II) the goods on or in connection with which and the areas in which each concurrent use exists;
> (III) the periods of each use; and
> (IV) the goods and area for which the applicant desires registration.

15 U.S.C. § 1051(a)(3)(A)–(D).

As this statement "must be truthful," a plaintiff may establish fraudulent procurement by proving that the defendant included a false representation in the statement. *Rosso & Mastracco, Inc. v. Giant Food Inc.*, 720 F.2d 1263, 1266 (Fed. Cir. 1983).

The Court now turns to the sufficiency of Jones's allegations.

> i.   <u>Jones has not established that the Hollywood Unlocked Defendants made a false representation regarding a material fact.</u>

To satisfy the first element, Jones must establish that the relevant "false or fraudulent representation . . . relate[s] to the trademark right that is registered, not to some other allegedly illegal aspect of the registrant's conduct." McCarthy § 31:85.

Here, Jones alleges that the Hollywood Unlocked Defendants, in conjunction with the Pilson Defendants, "falsely claimed [Hollywood Unlocked] owned and used the [Mark]" and that this representation was "made in writing and communicated over the internet to the USPTO." Compl. ¶

112. Further, as discussed in the Court's analysis of Jones's trademark infringement claim, Jones argues that he has a cognizable interest in the Mark due to his prior use of the Mark starting in June 2021. *See infra* Section II.G.

Upon review of the Complaint's allegations, the Court finds that Jones has not established that the Hollywood Unlocked Defendants made a false statement of material fact. First, the Complaint contains no allegations indicating that the Hollywood Unlocked Defendants did not use the Mark. Thus, a statement in the trademark application disclosing that the Hollywood Unlocked Defendants did use the Mark is not necessarily false. Indeed, if anything, the Hollywood Unlocked Defendants are simply junior users of the Mark.

As such, the Court does not find that Jones has met the first element. As Jones has failed to meet the first element of the claim for fraud in procuring the trademark, the Court does not analyze the remaining elements. The Court hereby GRANTS the Motion to Dismiss as to Jones's fourth cause of action. As the Court finds that Jones's fraud claim may be curable, it is DISMISSED WITH LEAVE TO AMEND. *See Cervantes*, 656 F.3d at 1041.

### F. Jones's conspiracy to commit fraud claim is improperly pleaded.

The parties' arguments regarding the fifth cause of action for conspiracy to commit fraud are identical to those for Jones's fraud claim. *See* Mot. at 24–25; Opp'n at 28–30.

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994). A civil conspiracy has two elements: (1) "the formation and operation of the conspiracy" and (2) "damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Id.* at 511. As both elements are required, the simple existence of a common plan or design is not a wrong in and of itself. *See id.* Instead, the conspiracy *must* be accompanied "by the commission of an actual tort." *Id.*; *see also Doctors' Co. v. Superior Ct.*, 775 P.2d 508, 510 (Cal. 1989) ("A civil conspiracy, however atrocious, does not give rise to a cause of action unless a civil wrong has been committed resulting in damage."); *117 Sales Corp. v. Olsen*, 145 Cal. Rptr. 778, 780

(Ct. App. 1978) ("No cause of action exists for the conspiracy itself. The pleaded facts must show something which, without conspiracy, would give rise to a cause of action.")

Here, as the Court has determined that Jones's fraud in procuring the trademark claim is insufficiently pleaded, the Court also finds that Jones has failed to establish the existence of a civil wrong. Accordingly, Jones's conspiracy to commit fraud claim is insufficiently pleaded.

> i. <u>Even if Jones had sufficiently alleged the existence of a fraud claim, the Court finds that he has failed to establish existence of a conspiracy.</u>

However, even if Jones's fraud claim was sufficiently pleaded, the Court finds that the Complaint does not allege sufficient facts to fulfill the first element of civil conspiracy—"the formation and operation of the conspiracy." *Applied Equip. Corp.*, 869 P.2d at 511. To satisfy this element, a plaintiff must establish the existence of an agreement to participate in the wrongful act. *Wasco Prods., Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 991–92 (9th Cir. 2006). The existence of an agreement "may be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances." *117 Sales Corp.*, 145 Cal. Rptr. at 780. Where, as here, plaintiff's fraud claim is grounded in intentional misrepresentation, the allegations must satisfy Rule 9(b)'s heightened pleading standard. *See In re First All. Mortg. Co.*, 471 F.3d 977, 998 (9th Cir. 2005); *see also Wasco Prod., Inc.*, 435 F.3d at 991 ("[Based on the plain language of Rule 9(b)] under federal law a plaintiff must plead, at a minimum, the basic elements of a civil conspiracy if the object of the conspiracy is fraudulent.").

In support of the conspiracy to commit fraud claim, the Complaint alleges:

> 118. At all relevant times, Defendants agreed to and did conspire to willfully and maliciously injure Plaintiff in his reputation, trade, business, and/or profession through the fraud committed by the Defendants.
> 119. Defendants agreed to and conspired to commit the frauds alleged herein, in that the Defendants conspired to steal Plaintiff's trademark and profit off of it. They had a meeting of the minds to accomplish that goal through one or more unlawful acts of fraud . . . and Plaintiff suffered harm as a result of Defendants' conduct and conspiracy.
> 120. As a direct and proximate consequence of Defendants' conspiracy, Plaintiff has been injured in his business, reputation, and property, causing Plaintiff to suffer monetary damages in an amount not less than $75,000, said damages to be proven at the time of trial.

121. Defendants' conduct as alleged . . . was done in furtherance of their own private interests and was willful, malicious, wanton, and oppressive, and done with conscious and callous indifference to the consequences with specific intent to harm. . . .

Compl. ¶¶ 118–21.

Jones's allegations are insufficient. Indeed, while Jones alleges that the Pilson Defendants and the Hollywood Unlocked Defendants "had a meeting of the minds," he provides no specific facts detailing when, where, and how this meeting took place, which representations the Hollywood Unlocked Defendants made to the Pilson Defendants in filing the trademark application, or even how or when the Pilson Defendants and Hollywood Unlocked Defendants came to enter into an agreement to file the trademark application. *See Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one . . . and inform each defendant separately of the allegations surrounding his alleged participation in the fraud.") (internal quotation marks omitted)). Not only does the Complaint merely recite the elements of a conspiracy claim—which is insufficient to meet the Rule 8(a) pleading standard, *Iqbal*, 556 U.S. at 678—but as pleaded, the allegations in the Complaint are just as indicative of innocent conduct as anything else. *See, e.g.*, *Twombly*, 550 U.S. at 564–65 (finding that plaintiffs' conspiracy allegations "[came] up short" as "the complaint leaves no doubt that plaintiffs rest their . . . claim on descriptions of parallel conduct and not on any independent allegation of actual agreement between [the defendants]."); *See also id.* at 565 ("[A]lthough in form a few stray statements speak directly of agreement, on fair reading these are merely legal conclusions resting on the prior allegations.")

Finally, the Complaint also includes allegations related to non-party Khia Shamone Finch Chambers ("Chambers"):

69. Upon information and belief, Defendants HOLLYWOOD UNLOCKED and JOHNSON have, on other occasions, acted to harm individuals Defendant JOHNSON did not like and/or believed wronged him.
70. Plaintiff is aware of at least two other performers who have been defamed, harassed, and threatened by Defendants JOHNSON and HOLLYWOOD UNLOCKED. At least one of these performers also had their trademarks infringed upon by Defendants HOLLYWOOD UNLOCKED, JOHNSON, PILSON, AND PILSON LAW GROUP, using a scheme similar to the instant case.

71. As an example, in December 2020, Defendants HOLLYWOOD UNLOCKED, JOHNSON, PILSON, and PILSON LAW GROUP improperly registered three service marks owned by another performer.

72. Khia Shamone Finch Chambers is a rapper and media personality known professionally as Khia.

73. At all times material, Khia was the owner and the user of three service marks: "Gag Order," "Gag Nation," and "Gagging."

74. Beginning no later than March 5, 2018, Khia used the mark Gag Order as the title for her weekly YouTube web series.

75. "Gag" is a term meaning joke or prank, and can be used in the same manner as the term roast. [21]

76. As part of her series, Khia roasts people in the news.

77. Since at least May 7, 2018, Khia has referred to this action as "gagging" and to herself and her followers, collective, as "Gag Nation."

78. At all times material, Khia has used the Instagram domain www.instagram.com/khiagagnation and username @khiagagnation.

79. Upon information and belief, in or around December 2020, a dispute arose between Khia and Defendants HOLLYWOOD UNLOCKED and JOHNSON.

80. Thereafter, Defendant HOLLYWOOD UNLOCKED, though its CEO, Defendant JOHNSON, and attorneys PILSON and PILSON LAW GROUP, submitted applications to the USPTO to trademark the marks Gag Order, Gag Nation, and Gagging.

81. On December 31, 2020, the USPTO granted Defendant HOLLYWOOD UNLOCKED's applications as to Gag Nation and Gagging.

82. On January 13, 2021, the USPTO granted Defendants HOLLYWOOD UNLOCKED's application as to Gag Order.

83. To date, Defendants continue to infringe upon Khia's three trademarks.

Compl. ¶¶ 69–83. *See also* Opp'n at 5–6.[22]

Jones's allegations involving Chambers do not establish the false or misleading nature of the Hollywood Unlocked Defendants' actions as they relate to Jones. At the March 31 Hearing, Jones clarified that he included the information to support the contention that the Pilson Defendants and the Hollywood Unlocked Defendants were engaged in "pattern or practice" affecting interstate commerce. However, Jones cites to no authority—and the Court is not aware of any—indicating that Jones may include allegations regarding the Defendants' conduct as it relates to a non-party in support of his claim that the Pilson and Hollywood Unlocked Defendants conspired to fraudulently procure the Mark at issue in the present action. Although the Court may rely on "other

---

[21] In this context, "roast" means to "to subject to severe criticism or ridicule." *Roast*, Merriam-Webster, https://www.merriam-webster.com/dictionary/roast (last visited Sept. 19, 2022).

[22] Further as discussed *infra* n.26, Jones fails to establish that he has standing to bring claims on behalf of Chambers.

circumstances," *117 Sales Corp.*, 145 Cal. Rptr. at 780, as the Complaint provides no allegations indicating that the Pilson Defendants and Hollywood Unlocked Defendants affirmatively agreed to commit a conspiracy, these allegations are just as indicative of innocent conduct as anything else. *See Twombly*, 550 U.S. at 564–65.

Accordingly, the Motion to Dismiss Jones's fifth cause of action is GRANTED. As the identified defects appear to be curable, Jones's claim for conspiracy to commit fraud is DISMISSED WITH LEAVE TO AMEND. *See Cervantes*, 656 F.3d at 1041.

**G.  Jones's trademark infringement claim is improperly pleaded.**

The Hollywood Unlocked Defendants argue that Jones has not presented sufficient facts to support his sixth cause of action under sections 1114 and 1125 of the Lanham Act because Johnson's counsel filed a valid application after confirming that The Mahne Tea was an unregistered mark. Mot. at 21. The Opposition, lodging no substantive arguments, solely refers to section 1114 of the Lanham Act. *See* Opp'n at 25–26. Although not addressed in this Opposition, in his Opposition to the Pilson Defendants' Motion to Dismiss, Jones clarified that he alleges only false designation of origin and false advertising in violation of 15 U.S.C. § 1125. ECF No. 55 at 3 ("[T]he Complaint does not mention [Section] 1114 at all. Instead, Plaintiff alleges direct infringement of an unregistered mark in violation of 14 [sic] U.S.C. § 1125."); *see also* Compl. at Count IV, ¶¶ 122–32 (alleging trademark infringement under 15 U.S.C. § 1125). Thus, the Court examines the sufficiency of Jones's claims only as they relate to Section 1125.

The Lanham Act makes "actionable the deceptive and misleading use of marks," and "protect[s] persons engaged in . . . commerce against unfair competition." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992) (citing 15 U.S.C. § 1127).

/ / /

/ / /

Section 43(a) of the Lanham Act, in relevant part, provides:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce . . . [any] false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). "Section 1125(a) creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).

However, a plaintiff bringing any claim under Section 43 must first establish that he has standing. *See* McCarthy § 32:3.50 ("[T]he proper procedural device to challenge 'statutory standing' is a [Federal Rule of Civil Procedure] § 12(b)(6) motion to dismiss for failure to state a claim."); *see also Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) ("[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983))).

### i. Jones has not adequately established standing.

Although not addressed by either party, the Court must consider whether Jones has sufficiently alleged statutory standing under section 43(a)(1)(A). Establishing standing under the Lanham Act requires that a plaintiff meet the following two-part test: the plaintiff must "(1) be within the "zone of interest" protected by the statute; and (2) show "'proximate causation' between plaintiff's injury and the alleged statutory violation." *Lexmark,*572 U.S. at129–33 (2014).

### 1. Jones is within the zone of interest.

To fall within a "zone of interest" "[the] plaintiff must allege an injury to a commercial interest in reputation or sales." *Lexmark*, 572 U.S. at 131–32. The Court must look to the text of the statute to determine whether the plaintiff's alleged injury falls within section 43(a)(1)(A)'s zone of interest. *See id.* at 129; McCarthy § 32:3.50.

The Supreme Court, relying on the contemporaneous Congressional record, has identified the following five zones of interest:

1. Making actionable the deceptive and misleading use of marks in such [interstate and foreign] commerce;
2. To protect registered marks used in such commerce from interference by State, or territorial legislation;
3. To protect persons engaged in such commerce against unfair competition;
4. To prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and
5. To provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

McCarthy § 32:3.50; *Lexmark*, 572 U.S. at 131.

First, the Court must evaluate whether Jones's claim against the Hollywood Unlocked Defendants falls into one of the five zones of interest. As shown by the enumerated list, specifically zones one and three, section 43(a)(1)(A) does not require that the plaintiff own a registered mark. *See* McCarthy § 27:13; *see also Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113–14; *Matal v. Tam*, 137 S. Ct. 1744, 1752 (2017) ("Without federal registration, a valid trademark may still be used in commerce."); *Two Pesos*, 505 U.S. at 768 ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks[.]").

Indeed, the Ninth Circuit has previously held that parties who own an unregistered mark or do not own the mark but have a "cognizable interest" in the mark, such as using the mark in the sale of goods and services, may bring suit under the Lanham Act. *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008) (finding that the plaintiff's prior use of an unregistered mark in the sale of goods and services is sufficient to establish standing under the Lanham Act). Here, Jones argues that he proceeds under a theory of "infringement of an unregistered mark." Opp'n at 3. He concedes that he did not have a federal trademark registration in the Mark at the time of the events underlying this action. *Id.*; Compl. ¶123.[23]

---

[23] Jones's allegations regarding his ownership of the Mark are contradictory. In the Complaint, he alleges that he "owns the [M]ark." Compl. ¶ 125. In the Opposition, however, he argues that he did not have a federal registration of the Mark at the time of the actions underlying this case. Opp'n at 26. During the March 31 Hearing, Jones clarified that he does not have a formal USPTO registration for the Mark. Instead, he has only filed an application. Accordingly, the Court treats Jones's relationship to the Mark as unregistered.

The parties dispute whether Jones's use of the Mark qualifies as use in commerce. The Hollywood Unlocked Defendants maintain that Jones failed to establish the link between the Mark and commerce as Jones "merely alleged that he was 'broadcasting' the Mark and using it on Twitter," Mot. at 22. While not addressed in the Opposition, a survey of the Complaint indicates that Jones argues that he has used the Mark in interstate commerce since September 2019, well before June 2021 when the Hollywood Unlocked Defendants sought to register the Mark. Compl. ¶¶ 26, 36–38.[24] Specifically, Jones maintains that he used the Mark in connection with his Bigo broadcast streams and on his Twitter account. Compl. ¶ 26. At the March 31 Hearing, Jones further explained that he generates income from his Bigo streams.

The Opposition is devoid of any argument regarding Jones's use of the Mark in commerce. However, Jones raises relevant arguments in his Opposition to the Pilson Defendants' Motion to Dismiss, contending that his Bigo broadcasts and Twitter are essential to his celebrity status and work as a media personality. ECF No. 55 at 3–4.[25] Viewing the Complaint with this argument in mind, Jones implies that his celebrity persona arises from the very fact of his online presence and that his online presence is the driving force behind his income. Compl. ¶¶ 46–47[26] (stating "celebrity gossip . . . is a popular topic among social media users" and that "[b]roadcasting such gossip . . . is nearly guaranteed to result in an increase in views and follows, and as a result, an increase in income and fame."). In short, Jones appears to consider himself to be a good—users navigate to his Twitter

---

[24] Jones's arguments regarding interstate commerce are more clearly articulated in his Opposition to the Pilson Defendants' motion to dismiss. *See* ECF No. 55 at 3–4 (where Jones concretely argues that he "undoubtedly" used to mark in interstate commerce because "Plaintiff is in the business of being a media personality in the area of celebrity gossip.").

[25] Jones's trademark infringement claim is brought against the Pilson Defendants and the Hollywood Unlocked Defendants and is based on the defendants' joint conduct. *See* Compl. at Count IV. It is therefore logical that Jones's arguments as to both sets of defendants be transferrable.

[26] Jones also appears to argue that the Hollywood Unlocked Defendants, by and through the Pilson Defendants, are engaged in a pattern of fraudulent trademark registration. *See* Compl. ¶¶ 69–83. He contends that the Hollywood Unlocked Defendants submitted applications to trademark three marks owned by non-party Khia Shamone Finch Chambers ("Chambers"). *Id.* However, Jones has made no showing that he has Article III standing to bring claims that are more appropriately brought by Chambers herself. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). At the March 31 Hearing, Jones clarified that he referenced the marks owned by Chambers to show that the Hollywood Unlocked Defendants engaged in a pattern of improperly registering trademarks. However, as previously discussed, the Court does not find these allegations support a finding of a conspiracy to commit fraud.

page, watch his Bigo stream, and pay him on Bigo to gain access to Jones's persona and opinions on celebrity gossip. *See id.* ¶¶ 24–25. Indeed, Jones is a self-described "influencer" and celebrity; implying he not only generates interest in a product but also has become a monetized product in and of himself. ECF No. 55 at 4; *see also White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992), *as amended* (Aug. 19, 1992) (holding that when infringement involves a celebrity endorsement, "[t]he 'strength' of the mark refers to the level of recognition the celebrity enjoys among members of society."). The Ninth Circuit has defined "use in commerce" as "roughly analogous to the in connection with sale of goods and services requirement of the infringement statute." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676 (9th Cir. 2005) (quotation marks omitted) (citing *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 903 (9th Cir. 2002)); *Mattel*, 296 F.3d at 903 (clarifying that the infringement statute "refers to a use of a famous and distinctive mark to sell goods other than those produced or authorized by the mark's owner").

Taking all allegations as true—as the Court must on a Rule 12(b)(6) motion to dismiss—the Court finds that Jones has sufficiently alleged his prior use of the Mark in commerce. While the parties may dispute whether Bigo broadcast streams qualify as commerce or whether Jones qualifies as a celebrity, these inquiries are more appropriate on a motion for summary judgment or at trial. The Court's duty on a 12(b)(6) motion is not to weigh the sufficiency of the facts but only to weigh the strength of the allegations in the Complaint. Instead, the Court must construe all allegations in the light most favorable to the plaintiff. *See Manzarek*, 519 F.3d at 1031. Here, viewing the facts in the light most favorable to Jones, the Court finds that Jones has sufficiently alleged that he falls within the zone of interest.

ii.   <u>Jones has not alleged proximate causation.</u>

While Jones may have alleged that he is personally engaged in interstate commerce, the Complaint fails to show that the Hollywood Unlocked Defendants, in registering the Mark, were similarly engaged in interstate commerce. To establish proximate causation under Section 1125(a), a plaintiff must "show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark*, 572 U.S. at 134. Jones alleges that the Hollywood

Unlocked Defendants' actions are "likely to cause confusion, mistake, and deception as to the affiliation, connection, association, origin, sponsorship, or approval of the Defendants' business activities." Compl. ¶ 129. He also alleges that he is "suffering irreparable harm as a direct result of Defendants' infringement of the trademark." *Id.* ¶ 130.

Jones allegations are linked to the use of the Mark in the course of interstate commerce. "Use in commerce" requires that the defendant "use . . . a famous or distinctive mark to sell goods [or services] other than those produced or authorized by the mark's owner." *Mattel*, 296 F.3d at 903. The Complaint contains no allegations relating to the Hollywood Unlocked Defendants' use of the Mark as is required under law. Instead, the Complaint only alleges that the Hollywood Unlocked Defendants, "citing their pending trademark application," had Jones suspended from Twitter and Bigo Live. Compl. ¶¶ 39–42; 63–65. There are no allegations detailing how—or if at all—the Hollywood Unlocked Defendants used the Mark in the course of the sale of any goods or services. Without such allegations, the Mark cannot be said to have been used by the Hollywood Unlocked Defendants in interstate commerce. Accordingly, as Jones has failed to plead that the Hollywood Unlocked Defendants used the Mark in interstate commerce, the Court finds that Jones has not shown that the Hollywood Unlocked Defendants' actions were the proximate cause of any alleged injury.[27]

As the standing analysis requires that the plaintiff meet both prongs—zone of interest and proximate cause—as Jones has failed at the first step, the Court finds that he is unable to establish standing under section 43.

> iii.  <u>Even if Jones were able to establish standing, he fails to state a claim under both bases under Section 1125(a).</u>

Even if Jones had been able to adequately establish standing, the Court still finds that he fails to state a claim under either basis provided by Section 1125. The parties' papers do not specify the

---

[27] The Hollywood Unlocked Defendants rely heavily on *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982) to argue that they cannot be held liable for trademark infringement. Mot. at 21. However, this case only considers trademark infringement under Section 1114. As Jones's trademark infringement claim proceeds under Section 1125, the Court finds this case inapplicable.

particular basis of liability Jones is proceeding under. Looking again to Jones's Opposition to the Pilson Defendants' Motion to Dismiss, Jones merely states that he is proceeding under a theory of "infringement of an unregistered mark." ECF No. 55 at 3. Accordingly, the Court analyzes the sufficiency of the Complaint as it relates to both bases.

> 1. *Jones has failed to state a claim for false association pursuant to §
> 1125(a)(1)(A).*

To establish a claim for false association under 15 U.S.C. § 1125(a)(1)(A), Jones must prove that he has a "valid, protectable trademark." *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873 (9th Cir. 1999). He must also prove that the Hollywood Unlocked Defendants "(1) use[d] in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of his or another person's goods or services." *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007). The Court addresses each factor in turn.

> a.  Jones has failed to establish that he has a "valid, protectable trademark."

The Hollywood Unlocked Defendants argue that Jones "has failed to demonstrate that his alleged mark was registered with the USPTO . . . ." Mot. at 21. As discussed above, the Court finds that Jones has an interest in the Mark. *See supra* Section II.A.i.a. However, a presumption of validity does not apply to unregistered marks. *See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 928 (9th Cir. 2005). Therefore, a plaintiff raising a trademark infringement claim on an unregistered mark bears the burden of establishing that the mark is valid when, as here, a defendant challenges the validity of the mark. *See id.*

Courts apply the same substantive law when determining infringement of registered and unregistered marks. *See* McCarthy § 27:18. The level of protection afforded to a mark is dependent on the mark's distinctiveness. *Two Pesos*, 505 U.S. at 768. The Ninth Circuit recognizes four levels of distinctiveness: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary and fanciful." *Filipino Yellow Pages, Inc. v. Asian J. Pubs., Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999) (citing *Surgicenters of Am., Inc. v. Med. Dental Surgeries Co.*, 601 F.2d 1011, 1014 (9th Cir. 1979)).

"Generic" and "descriptive" marks are the weakest of the four categories. A generic mark is the "genus of which the particular product or service is a species. It cannot become a trademark under any circumstances." *Filipino Yellow Pages*, 198 F.3d at 1147 (quoting *Surgicenters*, 601 F.2d at 1014). A "descriptive" mark "define[s] qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141–42 (9th Cir. 2002). "A descriptive term, unlike a generic term, can be a subject for trademark protection . . . provided that it has acquired 'secondary meaning' in the minds of consumers, i.e., it has 'become distinctive of the . . . goods [or services] in commerce.'" *Id.* (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10 (2d Cir. 1976)).

"Suggestive" and "arbitrary and fanciful" marks are "inherently distinctive" and thus offer the most protection. *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 826 (9th Cir. 1993) ("If a mark or dress is inherently distinctive it need not be shown to also have a secondary meaning."); McCarthy § 11:4. A mark is "suggestive" if "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance,  . . . the mark does not describe the product's features, but suggests them." *Entrepreneur Media*, 279 F.3d at 1142 (quotation marks omitted) (citing *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998)). "Arbitrary and fanciful marks . . . employ words and phrases with no commonly understood connection to the product." *JL Beverage v. Jim Beam Brands Co.*, 828 F.3d 1098, 1107 (9th Cir. 2016). "A 'fanciful' mark is a word that is coined for the express purpose of functioning as a trademark. It could also be any obscure or archaic term not familiar to buyers." McCarthy § 11:4. An "arbitrary mark" "is a word that is in common usage in the language, but is arbitrarily applied to the goods or services in question in such a way that it is does not even suggest some aspect of the goods or services." *Id.*

The Complaint does not allege any facts establishing which level of distinctiveness the Mark falls under. The only relevant allegation is found in paragraph 26, where Jones alleges "the [M]ark was distinctive and used to identify [Jones] to his followers." Compl. ¶ 26. Such conclusory

allegations are insufficient to survive a motion to dismiss.[28] *See Iqbal*, 556 U.S. at 678. Accordingly, the Court finds that Jones has not established that he has a valid, protectable mark.

The Court has previously determined that the Complaint has not sufficiently alleged that the Hollywood Unlocked Defendants used the Mark in commerce. As a false association claim cannot survive without a valid, protectable mark, there is no need for the Court to continue its inquiry— namely to consider whether the Hollywood Unlocked Defendants used "any word, false designation of origin, false or misleading description, or representation of fact, which . . . is likely to cause confusion or misrepresents the characteristics of his or another person's goods or services." *Freecycle Network*, 505 F.3d at 902.[29]

> 2. *Jones has failed to state a claim for false advertising pursuant to §*
> *1125(a)(1)(B).*

A false advertising claim pursuant to Section 1125(a)(1)(B) requires that

> (1) the defendant made a false statement either about the plaintiff's or its own
> product; (2) the statement was made in commercial advertisement or

---

[28] Indeed, on a motion to dismiss for failure to state a claim, courts generally weigh the allegations in the complaint that directly speak to how the relevant mark qualifies under a specific level of distinctiveness. *See, e.g.*, *ConsumerDirect, Inc. v. Pentius, LLC*, No. 8:21-cv-01968-JVS (ADSx), 2022 WL 1585702, at *7–8 (C.D. Cal. April 4, 2022) (weighing the plaintiff's specific allegations specifically addressing the use of the term in question in evaluating whether the mark qualifies as "generic."); *Benebone LLC v. Pet Qwerks, Inc.*, No. 8:20-cv-00850-AB (AFMx), 2020 WL 8732321, at *6 (C.D. Cal. Sept. 3, 2020) (finding concrete allegations such a "praise for [Plaintiff's] products' design language, shape, and flavor in print and television media; Plaintiff's significant investment in digital marketing and resulting consumer engagement connecting the company and its product design  consumers' association of the trade dress with [Plaintiff's] products; the products' established status in the market; and Defendant's purported 'wholesale copying' of Plaintiff's trade dress" sufficient to establish distinctiveness or secondary meaning on a 12(b)(6) motion to dismiss); *Orgain, Inc. v. N. Innovations Holding Corp.*, No. 8:18-cv-01253-JLS-ADS, 2018 WL 7504409, at *4–5 (C.D. Cal. Dec. 6, 2018) (finding that the plaintiff had not plausibly alleged a mark is distinctive as "[n]othing in the Complaint points to a characteristic, feature or ingredient of Plaintiff's product that [the mark] supposedly *describes*."); *U.S. Vessel Documentation v. Form Techs., LLC*, No. SACV 17-00823-CJC(JCGx), 2017 WL 8232081, at *3 (C.D. Cal. Sept. 21, 2017) (evaluating the Second Amended Complaint to determine whether the plaintiff sufficiently alleged that the mark is generic).

[29] The Court reminds the parties that it is not the role of the Court to make parties' arguments for them. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("Courts are essentially passive instruments of government . . . . They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties.") (quotation marks and internal citations omitted); *Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003); *see also Hibbs v. HDM Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001) (declining to address an "argument . . . too undeveloped to be capable of assessment").

37

> promotion; (3) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (4) the deception is material; (5) the defendant caused its false statement to enter interstate commerce; and (6) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to the defendant, or by a lessening of goodwill associated with the plaintiff's product.

*Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1052 (9th Cir. 2008) (quoting

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829 (9th Cir. 2002)).

Here, the Complaint contains no allegations indicating that the Hollywood Unlocked Defendants—or any other defendant—made false statements about any product owned or produced by Jones. As the Complaint fails at the first step of the Section 1125(a)(1)(A) analysis, the Court stops its inquiry here.

Accordingly, the Court finds that Jones has not adequately stated a claim for false advertising pursuant to Section 1125(a)(1)(B). The Court thus GRANTS the motion to dismiss as to Jones's sixth cause of action for trademark infringement. As the Court does not find amendment to be futile, this claim is DISMISSED WITH LEAVE TO AMEND. *See Cervantes*, 656 F.3d at 1041.

### H.  Jones's cyberpiracy claim is improperly pleaded.

The Hollywood Unlocked Defendants argue that Jones's seventh cause of action for cyberpiracy fails to meet the 12(b)(6) pleading standard as he only provides a recital of the causes of action and fails to specifically name the defendants in this claim. Reply at 9. In response, Jones argues that Rule 12(b)(6) merely requires that he allege that it is plausible that the Hollywood Unlocked Defendants committed the alleged tort, a standard that the Complaint cleanly meets. Opp'n at 25.

Cyberpiracy, also known as "cybersquatting," is governed by the Anti-Cybersquatting Consumer Protection Act. ("ACPA") 15 U.S.C. § 1125(d); *see also* McCarthy § 25A:49. A "cybersquatter" is a person who "knowingly obtains from a registrar a domain name consisting of the mark or name of a company for the purpose of ransoming the right to that domain name back to the legitimate owner for a price." McCarthy § 25A:48. To prevail on a cyberpiracy claim, a plaintiff must prove "that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the

defendant acted with bad faith intent to profit from that mark." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218–19 (9th Cir. 2010) (citing 15 U.S.C. § 1125(d)).

The Court begins with the first factor—whether the defendant "registers, traffics in, or uses" an offending domain name. This first factor establishes the defendant's liability. McCarthy § 25A:52. "The trilogy of registration, trafficking and use of a domain name are separate acts and liability may be based on any one." *Id.* Jones bases his cyberpiracy claim on his prior use of "themahnetea" as his Twitter handle and, as a result, as a part of his Twitter domain at www.twitter.com/themahnetea and the Hollywood Unlocked Defendants' subsequent registration of the Mark with the USPTO. Compl. ¶¶ 133–41. However, the ACPA applies to a defendant's use of the plaintiff's mark or domain name on the internet in the form of a website. The Complaint contains no allegations indicating that the Hollywood Unlocked Defendants used "themahnetea" as a domain name. Further, while Jones does not cite any law finding that the handle-specific portion of a Twitter domain qualifies as a domain name, the ACPA and Ninth Circuit case law do not support such a finding.

The ACPA defines a domain name as "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." 15 U.S.C. § 1117; *see also* McCarthy § 25A:50. The Ninth Circuit has clarified this definition, explaining that a domain name is comprised for two parts: a "top-level" domain ("TLD") or "the portion of the domain name to the right of the first period" and a "second-level" domain ("SLD"). *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698 (9th Cir. 2010). TLDs include "com, .gov, .net., and .biz." *Id.* A SLD is a portion of the TLD and is "by the designation to the left of the first period, such as 'example' in 'example.com' or 'example.net.'" *Id.* To qualify as a domain name, the domain name must be registered with a registry operator. *Id.* ("A domain name is created when it is registered with the appropriate registry operator. A registry operator maintains the definitive database, or registry, that associates the registered domain names with the proper IP numbers for the respective domain name servers."). The handle specific portion of a Twitter website does not designate a domain name in and of itself. Instead, it qualifies as a "post-domain path" and thus distinct from the domain name itself. *See*

*Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 691 (6th Cir. 2003) ("Each web page within a website has a corresponding uniform resource locator ('URL') (e.g., a2zsolutions.com/ desks/floor/laptraveler/dkfl-lt.htm), which consists of a domain name and a post-domain path. A post-domain path (e.g., /desks/floor/laptraveler/dkfl-lt.htm) merely shows how a website's data is organized within the host computer's files.)"); *see also id.* at 695–97 ("a website's domain name signifies its source of origin . . . . the post-domain path serves a different function and does not signify source of origin.") (quotation marks and citation omitted).

With this guidance in mind, it is clear that Jones's cyberpiracy claim contains two fatal flaws. First, "themahnetea" does not qualify as a domain name. As previously stated, a domain name signifies a source of origin. Analyzing the website in question—www.twitter.com/themahnetea—the domain name is restricted to the TLD or "twitter.com." The "themahnetea" instead qualifies as the "post-domain name path"[30] or as a "vanity URL."[31] Second, Jones bases his claim on a USPTO registration, which is distinct from registration with a domain name registry operator. Indeed, under the ACPA registration specifically "refers to the action of reserving or registering a domain name with a domain name registrar." McCarthy §25A:52. The Complaint contains no allegations indicating that Jones or the Hollywood Unlocked Defendants attempted to register "themahnetea" with a domain name operator.[32] The Complaint and briefing make no allegations as to the

---

[30] *See United Fed'n of Churches, LLC v. Johnson*, 522 F. Supp. 3d 842, 852 (W.D. Wash. 2021), *reconsideration denied*, No. C20-0509RAJ, 2022 WL 1093025 (W.D. Wash. Apr. 12, 2022) (defining the domain name in "facebook.com/TheSatanicTempleWashington" as only "facebook.com." because "[u]nder 15 U.S.C. § 1127, to be considered a 'domain name,' an 'alphanumeric designation' must be registered with a domain name registrar, domain name registry, or other domain name registration authority. The domain 'facebook.com' may well be registered. But nowhere in the complaint does The Satanic Temple allege that the term '/TheSatanicTempleWashingtion' itself is also registered.").

[31] *See United Fed'n of Churches*, 522 F. Supp. 3d at 851 (defining vanity URLs as "a unique, personalized URL.") (citing Natalma M. McKnew, Post-Domain Infringement: In Search of a Remedy, Am. B. Ass'n (Mar. 22, 2010), https://www.americanbar.org/groups/business_law/publications/blt/2010/03/08_mcknew/); *see also id.* ("[f]or example, Facebook user John Doe might be reached at www.facebook.com/johndoe. The vanity URL, '/johndoe,' is thus contained in the post-domain path.").

[32] *See, e.g.*, *United Fed'n of Churches*, 522 F. Supp. 3d at 851 (declining to find a domain name on similar grounds).

Hollywood Unlocked Defendants' liability regarding the "use" and "trafficking" of the domain name. Accordingly, the Court does not consider these two bases of liability.[33]

Jones therefore cannot establish liability towards the Hollywood Unlocked Defendants. Accordingly, the cyberpiracy claim fails at the first factor.

As Jones fails to satisfy the first factor, the Court stops its analysis here and does not evaluate the second—whether the Hollywood Unlocked Defendants used the Mark in an "identical or confusingly similar" manner—third—whether "the plaintiff's mark was distinctive at the time of the defendant's registration"—and fourth factors—whether the Hollywood Unlocked Defendants acted with a bad faith intent to profit from the mark. *DSPT Int'l*, 624 F.3d at 1218–19. As Jones may be able to provide allegations showing that the Hollywood Unlocked Defendants utilized the Mark as a domain name consistent with the ACPA, amendment does not appear to be futile. Accordingly, this claim is dismissed with LEAVE TO AMEND. *See Cervantes*, 656 F.3d at 1041.

### I. The Court postpones its determination of Jones's claims for defamation per se and trade libel/business disparagement.

As discussed above, Jones's defamation *per se* and trade libel/business disparagement claims as they relate to communications made on social media cannot be considered by the Court at this juncture. Accordingly, the Court postpones ruling on the eighth and ninth causes of action until the parties complete adequate discovery.

### J. Jones's group boycott claim is insufficiently pleaded.

Jones's tenth cause of action proceeds under group boycott pursuant to the Sherman Act, 15 U.S.C. § 1. Compl. ¶¶ 156–62. The Hollywood Unlocked Defendants appear to argue that this claim should be dismissed as Jones does "nothing more that [sic] to provide formulaic recitations of the elements" of this cause of action. Mot. at 26. In response, Jones argues that he has met all of the requirement elements of this claim. Opp'n at 30–31.

---

[33] Again, it is not the role of the Court to make parties' arguments for them. *See Sineneng-Smith*, 140 S. Ct. at 1579 ("Courts are essentially passive instruments of government . . . . They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties.") (quotation marks and internal citations omitted).

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade commerce . . . is declared to be illegal." 15 U.S.C. § 1. To bring a claim under the Sherman Act, a plaintiff must meet four separate factors: (1) the existence of a conspiracy; (2) the intention on the party of the co-conspirators to harm or restrain competition; (3) actual injury to competition; and (4) that the plaintiff suffered "antitrust injury" that is "harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012).

Group boycott, however, is a *per se* violation of Section 1 of the Sherman Act. *See Adaptive Power Sols., LLC v. Hughes Missiles Sys. Co.*, 141 F.3d 947, 949–50 (9th Cir. 1998); *Washington State Bowling Proprietors Ass'n v. Pac. Lanes, Inc.*, 356 F.2d 371, 376 (9th Cir. 1966) ("Group boycotts are per se violations of the Sherman Act."). A "group boycott" is "a very broad label for divergent types of concerted activity." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 453 n.5 (9th Cir. 2021) (citing *Phil Tolkan Datsun, Inc. v. Greater Milwaukee Datsun Dealers' Advert. Ass'n.*, 672 F.2d 1280, 1284 (7th Cir. 1982)). It includes agreements between "*two or more competitors* [to] refuse to do business with one firm." *City of Oakland*, 20 F.4th at 454 (quotation marks omitted) (citing Black's Law Dictionary (11th ed. 2019)). The Ninth Circuit, borrowing from the D.C. Circuit, has stated that "[t]he classic group boycott is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level where in the group operates." *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 834 (9th Cir. 2022) (quoting *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)). Further, per se violations are limited to direct, or horizontal, competitors. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283–84 (2018) ("Typically only 'horizontal' restraints—restraints imposed by agreement between competitors— qualify as unreasonable per se.") (internal quotation marks omitted).

The Ninth Circuit has outlined three characteristics indicative of a group boycott: "(1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to

compete; (2) the boycotting firm possesses a dominant market position; (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition." *Adaptive Power Sols.*, 141 F.3d at 949 (quoting *Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1030 (9th Cir. 1988)). The Court evaluates each factor in turn.

      i.  <u>The alleged boycott cuts off access to a market necessary to enable Jones to compete</u>

In support of this factor, the Complaint alleges that the Hollywood Unlocked Defendants are Jones's "horizontal competitors" and "combined and conspired to restrain trade in violation of the Sherman Act Section 1 by engaging in a scheme to shut [Jones] out of the BIGO Live market and related markets," Compl. ¶¶ 157–58. Specifically, Jones argues that he has met this first factor's requirements as he has alleged that

> 36. On or about June 11, 2021, Defendant HOLLYWOOD UNLOCKED, though its CEO, Defendant JOHNSON and attorneys, Defendants PILSON and PILSON LAW GROUP, filed an application with the United States Patent and Trademark Office (USPTO) to register The Mahne Tea as a service mark.
> 63. On or about September 17, 2021, Defendants HOLLYWOOD UNLOCKED and JOHNSON reported Plaintiff to Bigo Life for an alleged trademark violation, citing their June 11, 2021 application, despite that Plaintiff had used the mark for at least 18 months prior.
> 66. To this day, Defendants HOLLYWOOD UNLOCKED, JOHNSON, CLOSS and BELLEFLEUR continue to spread lies and untruths about Plaintiff in writing and via livestream.

Compl. ¶¶ 36, 63, 66. The Complaint also alleges that "Defendants' agreement and actions in furtherance of the conspiracy restrict [Jones's] ability to compete in the BIGO Live market and related markets." *Id.* ¶ 159.

The Court finds these allegations sufficient. Jones has alleged that the Hollywood Unlocked Defendants used their trademark application to have Jones banned from Bigo Live; temporarily excluding him from the Bigo Live streaming market and cutting him off from a revenue source. Jones's allegations also imply that the Hollywood Unlocked Defendants' "lies and untruths" about Jones's character have impacted his access to the Bigo Live market, and ultimately, his ability to compete with the Hollywood Unlocked Defendants. The Court, viewing the allegations in the light most favorable to Jones, finds this sufficient to establish that the Hollywood Unlocked Defendants inhibited Jones's ability to compete in the Bigo Live market. *Compare PLS.com, LLC*, 32 F.4th at

834  (finding that plaintiff had satisfactorily alleged evidence of a group boycott where its competitor defendants had coerced essential members of the market out of doing business with plaintiff, or to only do business with plaintiff under "highly unfavorable terms," with the express purpose of preventing [plaintiff], a new entrant to the market after decades of little to no competition, from competing" successfully "foreclos[ing] [plaintiff] from the commercial opportunities necessary to innovate and grow"); *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 541 (1978) ("The generic concept of boycott refers to a method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target"), *with City of Oakland*, 20 F.4th at 454 (not finding evidence of group boycott where the football teams affiliated with the defendant "simply supported the [Defendant's] refusal to deal with the City, but did not themselves refuse to do business with the City" and thus only alleged "an individual boycott [not] a group boycott.").

> ii.   Jones has not alleged that the Hollywood Unlocked Defendants hold a "dominant market position"

The next factor requires that the Hollywood Unlocked Defendants have a "dominant market position" in the relevant industry. "Dominant" is "an undefined term, but plainly chosen to stand for something different from antitrust's term of art 'monopoly.'" *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000).

The Opposition argues that "at least two parties to the agreement were direct competitors." Opp'n at 31 (citing Compl. ¶ 157). However, this is not the whole of the requirement. The parties must not just be competitors, the defendant must also hold a dominant market position. Here, it is unclear whether the Complaint provides such allegations. Indeed, the Complaint appears to allege that Jones, not the Hollywood Unlocked Defendants, had a dominant position in the Bigo Live market. *See* Compl. ¶¶ 29–32; 35 (alleging that it was the Hollywood Unlocked Defendants who contacted Jones in an attempt to tap into and ultimately profit off of Jones's greater popularity on Bigo Live.). A dominant market position requires that the competitor control a substantial share of the relevant market or exercise control over the relevant market to "its own discretion." *See, e.g.*, *Aerotect Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1175 (9th Cir. 2016) (where the

defendant was found to dominant the relevant industries with more than 75 percent control of the industry); *see also* Dominant Position, Black's Law Dictionary (11th ed. 2019) ("The market situation of a business that can behave in disregard of suppliers and customers and as if it has little or no competition, allowing it to set prices, supplies, production levels, product quality, means of distribution, etc. according to its own discretion."). There are no such allegations here. Accordingly, Jones has not met the second factor.

As Jones has failed to establish the second factor, the Court need not consider whether the Complaint meets the final factor— whether the practices are justified by plausible arguments that they enhanced overall efficiency or competition. Jones's tenth cause of action for group boycott claim is DISMISSED. As the Jones may still be able to plead sufficient facts to meet all three factors outlined by the Ninth Circuit, this claim is DISMISSED WITH LEAVE TO AMEND. *See Cervantes*, 656 F.3d at 1041.

### K. Jones's claims for specific performance and "declaratory relief, with request for temporary preliminary and permanent [injunctive] relief" are improper.

Jones brings two final causes of action; the eleventh cause of action for "specific performance" and the twelfth cause of action for ""declaratory relief, with request for temporary [,] preliminary [,] and permanent injuntive [sic] relief." *See* Compl. ¶¶ 163–68. Jones fails to specify against which defendants he brings these two causes of action. *See id.* However, even if they had been specifically pleaded against the Hollywood Unlocked Defendants, the Court may not reach a decision on the merits. Indeed, both counts involve *remedies*, not causes of action. *See, e.g.*, *Rogers v. Davis*, 34 Cal.Rptr.2d 716, 718 n.2 (Ct. App.1994) (holding that specific performance is an "alternative remed[y] for a breach of contract"); *McDowell v. Watson*, 69 Cal. Rptr. 2d 692, 695 (Ct. App. 1997) ("Injunctive relief is a remedy and not, in itself, a cause of action.") (quoting *Shell Oil Co. v. Richter*, 125 P.2d 930, 933 (Ct. App. 1942); *Canova v. Trustees of Imperial Irrigation Dist. Emp. Pension Plan*, 59 Cal. Rptr. 3d 587, 595 (Ct. App. 2007) (holding that declaratory relief is not a cause of action as it "operates prospectively to declare future rights, rather than to redress past wrongs."); *Hood v. Superior Ct.*, 39 Cal. Rptr. 2d 296, 298 (Ct. App. 1995) (where declaratory relief was deemed to be "unnecessary and superfluous" because the "issues invoked in [the] cause of

action already were fully engaged by other causes of action."). Accordingly, the Court DISMISSES the eleventh and twelfth causes of action. As neither may be brought as claims, leave to amend would be futile. Accordingly, both counts are dismissed WITH PREJUDICE.

### CONCLUSION

For the reasons stated above, the Motion to Dismiss is GRANTED IN PART. The Court further POSTPONES ruling on the Hollywood Unlocked Defendants' Motion to Strike. The Court ORDERS the following:

1. Jones's first, second, third, fourth, fifth, sixth, seventh, and tenth causes of action are DISMISSED WITHOUT PREJUDICE;

2. Jones's eleventh and twelfth causes of action are DISMISSED WITH PREJUDICE;

3. The Jones and the Hollywood Unlocked Defendants shall submit a discovery plan regarding the facts relevant to Jones's defamation per se and trade libel claims no later than thirty (30) days from the date of this Order;

4. The Court postpones its determination on the eighth and ninth causes of action pending completion of the parties' relevant discovery necessary for the Motion to Strike; and

5. To the extent that Jones desires to amend any of the claims dismissed with leave to do so, he is ORDERED to file a First Amended Complaint within thirty (30) days of this Order.

IT IS SO ORDERED.

Dated: November 22, 2022

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge